UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: MARK A. NORDLICHT,

                              Debtor.

---

RICHARD STADTMAUER *and* MARISA
STADTMAUER,

                              Appellants,

          v.

MARK A. NORDLICHT, DAHLIA
KALTER, 535 W.E.A. GROUP LLC, OBH
2308 LLC, NYFLA INVESTORS LLC,
GILAD KALTER COOK ISLANDS TRUST
LIMITED, TRENOR INVESTMENT
PARTNERS LP, HENLEY INVESTMENT
PARTNERS LP, JOHN DOES 1–50, *and*
MARK S. TULIS, as Chapter 7 Trustee,

                              Appellees.

No. 21-CV-5990 (KMK)

OPINION & ORDER

James B. Glucksman, Esq.
Davidoff Hutcher & Citron LLP
White Plains, NY
*Counsel for Appellants*

Nathaniel J. Kritzer, Esq.
Jason E. Meade, Esq.
Steptoe & Johnson LLP
New York, NY
*Counsel for Appellants*

Salvatore LaMonica, Esq.
Jacqulyn S. Loftin, Esq.
LaMonica Herbst & Maniscalco, LLP
Wantagh, NY
*Counsel for Appellee Mark S. Tulis, as Chapter 7 Trustee*

Michael Levine, Esq.
Levine & Associates, P.C.
Scarsdale, NY
*Counsel for Appellees Dahlia Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors*
*LLC, Gilad Kalter Cook Island Trustee Limited, Trenor Investment Partners LP, and Henley*
*Investment Partners LP*

Scott Krinsky, Esq.
Backenroth Frankel & Krinsky, LLP
New York, NY
*Counsel for Debtor Mark A. Nordlicht*

KENNETH M. KARAS, United States District Judge:

Richard and Marisa Stadtmauer ("Appellants" or the "Stadtmauers") bring this appeal

seeking reversal of the June 2, 2021 Amended Order Granting the Trustee the Authority to Settle

Claims Pursuant to the Modified Settlement Offer from the Settling Parties (the "Order") from

the Honorable Robert D. Drain ("Judge Drain" or the "Bankruptcy Court").  (*See generally* Not.

of Appeal (Dkt. No. 1).)  For the reasons set forth herein, the Court affirms the Order.

## I.  Background

### A.  Factual Background

#### 1.  Underlying Arbitration & State Court Action

Mark A. Nordlicht ("Nordlicht" or the "Debtor") was the founder and general partner of

the now-defunct Platinum Management (NY) LLC, which—in turn—was the general partner and

investment advisor to Platinum Partners Value Arbitrage Fund LLP, a set of hedge funds known

collectively as "PPVA."  (*See* A.R. A119–35 ("Arbitration Decision"), at A120, A122.)[1]

Nordlicht also served as a manager of PPVA.  (*See id.* at A122.)  The Stadtmauers were investors

---

[1] Citations to "A.R." refer to the record on appeal, filed as a series of appendices to both
Appellants' opening brief, (*see* Dkt. No. 10), and Appellees' answering brief, (*see* Dkt. No. 16).
Record citations included in the appendices filed by Appellants are referenced in the format
"A[page number]"; record citations included in the appendices filed by Appellees are referenced
in the format "RA[page number]."

in PPVA, and on May 27, 2016, PPVA issued two promissory notes to the Stadtmauers, which

Nordlicht personally guaranteed via a separate agreement executed the same day.  (*See id.* at

A120.)  PPVA ultimately defaulted on its promissory notes to the Stadtmauers, triggering

Nordlicht's guaranty; however, Nordlicht refused to honor the guaranty, leading the Stadtmauers

to pursue enforcement via arbitration.[2]  (*See id.*)  On January 10, 2020, the Stadtmauers received

a final award of $14,896,316.16.  (*See id.* at A115–17.)

On February 5, 2020, the Stadtmauers attempted to collect on the debt via a complaint

brought in Westchester County Court (the "State Court Action") against Nordlicht; Nordlicht's

wife, Dahlia Kalter ("Kalter"); a number of entities controlled by Nordlicht, Kalter, and

Nordlicht's father (535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad

Kalter Cook Island Trust Limited, Trenor Investment Partners LP, and Henley Investment

Partners LP); and John Does 1–50, representing "onshore and offshore LLCs, partnerships,

trusts, holding companies, and other entities of various jurisdictions and legal statuses . . . , as

well as family members and associates of [] Nordlicht" (collectively, the "State Court

Defendants").  (*See id.* at A093–113 ("State Court Complaint"), at A095–97.)  The Stadtmauers

alleged that Nordlicht had "engaged in a complex, far-reaching scheme to alienate assets and

property to make himself 'judgment proof'" in order to "defraud and frustrate his creditors," and

---

[2] The Platinum Partners entities were ultimately shuttered after the Securities and Exchange Commission brought securities fraud charges against the entities and a number of their officers and managers, including Nordlicht.  *See, e.g.*, Press Release, *SEC Charges Platinum Funds and Founder With Defrauding Investors*, U.S. Securities and Exchange Commission (Dec. 19, 2016), https://www.sec.gov/news/pressrelease/2016-267.html.  Nordlicht was convicted at trial of conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud.  *See United States v. Landesman*, 17 F.4th 298, 317 (2d Cir. 2021).  The district court granted Nordlicht's motion for a new trial, but this order was vacated by the Second Circuit in November 2021.  *See id.* at 317, 332.  Nordlicht has filed a petition for a writ of certiorari to the Supreme Court.  *See* Pet. for Writ of Certiorari, *Nordlicht v. United States* (No. 21-1319).

put forth fraudulent conveyance and alter ego claims to target assets held by the various corporate entities controlled by Kalter and Nordlicht's family members.  (*Id.* at A093.) Simultaneously, the Stadtmauers moved ex parte for an order of attachment against certain real property identified by the Stadtmauers as allegedly belonging to Nordlicht, though not held in his name.  (*See id.* at A195–97.)  On February 14, 2020, the Stadtmauers filed a notice of attachment on real property against a property located at 535 West End Avenue, Unit No. 15, New York, NY ("535 WEA"), and on February 18, 2020, the Stadtmauers filed a notice of attachment on real property against a property located at 245 Trenor Drive, New Rochelle, NY ("245 Trenor Drive").  (*See id.* at A192–94, A198–99.)  On May 22, 2020, the County Court granted the Stadtmauers' motion to confirm the attachment.  (*See id.* at A203–10.)

On June 25, 2020, the Stadtmauers filed a motion to supplement their complaint in the County Court with three additional entities as defendants: 16th Avenue Associates LLC, Trenor Trust, and Jerome Management LLC (the "Proposed Supplemental State Court Defendants"). (*See id.* at A216–38.)  However, on June 29, 2020, Nordlicht filed a voluntary petition under Chapter 7 of the Bankruptcy Code, which stayed the State Court Action before the County Court could rule on the Stadtmauers' motion.  (*See id.* at A239–40.)  On the same day, certain of the State Court Defendants removed the State Court Action to federal court, which was referred to Judge Drain and designated an adversary proceeding.  (*See id.* at A241–45.)

### 2.  Bankruptcy Court Proceedings

On July 6, 2020, Mark S. Tulis was appointed as the interim Chapter 7 Trustee (the "Trustee") of Nordlicht's estate, and by operation of law became the permanent trustee of the estate.  (*See id.* at A268.)  On October 26, 2020, the Trustee entered into a stipulation with the State Court Defendants, the Proposed Supplemental State Court Defendants, and Nordlicht's mother, Barbara Nordlicht ("Ms. Nordlicht"; collectively, the "Settling Parties") to resolve the

4

estate's interest in the fraudulent conveyance and alter ego claims brought in the State Court Action (the "Claims") and any other claims that could be asserted on behalf of the estate against the Settling Parties for $1.5 million.  (*See id.* at RA168–93.)  On November 6, 2020, the Trustee moved before Judge Drain for an order approving the stipulation of settlement.  (*See id.*)

The Stadtmauers objected to the Trustee's motion on January 6, 2021, and presented a counteroffer, offering "$2 million to the estate, free and clear of [the Stadtmauers'] judicial liens secured pre-petition, in exchange for all of the rights, claims, and interests that the Trustee seeks to settle and release."  (*See id.* at A142–86 (emphasis omitted).)  In response, the Trustee advised the Bankruptcy Court that "[t]he offer made by the Stadtmauers . . . presents the estate with a change in circumstances and significant benefits of increased compensation for the sale and assignment of the very same claims that are being compromised in the [s]tipulation," as such, that the Trustee had determined that "the Stadtmauer[s'] [o]ffer presents the estate with significant benefits over the terms of the [s]tipulation and is in the best interests of the estate." (*Id.* at A308–16.)  Nordlicht disagreed and requested that Judge Drain approve the stipulation entered into between the Trustee and the Settling Parties.  (*See* Bankr. Dkt. No. 18.)[3]

On March 4, 2021, the Trustee and the Stadtmauers entered into a purchase and assignment agreement by which the Trustee agreed to sell and assign the Claims to the Stadtmauers for $2 million, (*see* A.R. RA221–26), which was put before the Bankruptcy Court via the Stadtmauers' March 8, 2021 response to Nordlicht's reply, (*see id.* at RA228–35).  On March 10, 2021, the Settling Parties opposed the Stadtmauers' purchase and assignment agreement as not in the best interest of the estate, and presented an increase to their original

---

[3] The Court uses "Bankr. Dkt." To refer to filings on the adversary Bankruptcy Court docket, *Stadtmauer, et al. v. Nordlicht, et al.*, No. 20-AP-6489 (Bankr. S.D.N.Y.).

offer: (1) $2 million to settle the Claims; (2) payment of legal fees necessary to defend against the Stadtmauers' asserted liens and other claims, and (3) waiver of Ms. Nordlicht and Kalter's claims for reimbursement of legal fees and expenses. (*See id.* at RA250–60.)

The Bankruptcy Court held a hearing on March 11, 2021 to consider the Trustee's motion to approve the original stipulation with the Settling Parties and the objections thereto. (*See id.* at RA264–300.) During the hearing, the Trustee informed the Bankruptcy Court that he had determined that the Stadtmauers' increased offer was more valuable to the estate than the Settling Parties' increased offer because the Stadtmauers' offer included the additional consideration of freeing the estate from costly litigation over the Stadtmauers' asserted liens. (*See id.* at RA278.) The Bankruptcy Court agreed and denied the Trustee's motion to approve the original stipulation. (*See id.* at A317–18.) The Bankruptcy Court also instructed the Trustee to move for approval of the Stadtmauers' increased offer, and, accordingly, to invite other parties in interest to submit higher and better offers for the sale and assignment of the Claims. (*See id.* at RA296.)

On April 21, 2021, the Settling Parties submitted a competing offer for $2.2 million, which the Trustee rejected as not a higher and better offer in light of the value of the Stadtmauers' release of their asserted liens. (*See id.* at A025–26.) On April 22, 2021, the Settling Parties submitted a new competing offer, this time which included: (1) $2.5 million to purchase the Claims; (2) payment of legal fees and expenses in connection with any future litigation over the Stadtmauers' asserted lien and other claims, including this Appeal; and (3) $2.5 million to be paid by Ms. Nordlicht to indemnify the estate if the Stadtmauers prevailed in the litigation over their asserted liens (the "Modified Offer"). (*See id.* at A005–15.) The Trustee determined that in light of the indemnification, the Settling Parties' Modified Offer was

a higher and better offer than the Stadtmauers' increased offer, and recommended that the Bankruptcy Court approve it. (*See id.* at A026.)

The Bankruptcy Court held a hearing on April 23, 2021 to consider the approval of the Stadtmauers' purchase and assignment agreement and any competing offers. (*See id.* at A016–70.) After the Trustee presented the offers outlined above, the Bankruptcy Court opened the floor for bidding; the Stadtmauers rested on their outstanding offer. (*See id.* at A033–34.) After hearing oral argument, the Bankruptcy Court ultimately agreed with the Trustee, and approved the Settling Parties' Modified Offer as the highest and best offer, (*see id.* at A056–69); the Bankruptcy Court entered an Order to this effect on June 2, 2021, (*see id.* at A001–04 (the "Order")). This Appeal followed.[4]

B.  Procedural History

Appellants filed their Notice of Appeal on July 13, 2021. (*See* Dkt. No. 1.) On the same day, Appellants filed a designation of items to be included in the record on appeal, (*see* Dkt. No. 3); the Trustee and Appellees filed counter-designations on August 17, 2021, (*see* Dkt. Nos. 4–6). After seeking and receiving an extension of time to file their opening brief, (*see* Dkt. Nos. 8–9), Appellants filed their brief on October 22, 2021, (*see* Br. of Appellants in Supp. of Appeal ("Appellants' Br.") (Dkt. No. 10)). After seeking and receiving an extension of time to file their answering briefs, (*see* Dkt. Nos. 11–12), the Trustee and Appellees separately filed their briefs on January 10, 2022, (*see* Br. of Trustee ("Trustee's Br.") (Dkt. No. 14); Joint Br. of

---

[4] Due to the procedural history of this Action, the Appellees include the State Court Defendants (Nordlicht, Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Islands Trust Limited, Trenor Investment Partners LP, Henley Investment Partners LP, and John Does 1–50) and the Trustee. The Trustee is individually represented on this appeal, and the State Court Defendants are jointly represented. For clarity, the Court will refer to the State Court Defendants as "Appellees" and the Trustee as the "Trustee."

Appellees ("Appellees' Br.") (Dkt. No. 15)).  After seeking and receiving another extension of

time, (*see* Dkt. Nos. 20–21), Appellants filed their Reply brief on March 15, 2022, (*see* Reply Br.

of Appellants ("Appellants' Reply") (Dkt. No. 22)).

## II.  Discussion

### A.  Standard of Review

The Court has jurisdiction to review this appeal pursuant to 28 U.S.C. § 158(a)(1).  *See*

*Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 700 (S.D.N.Y. 2014).  "This Court may affirm,

modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions

for further proceedings."  *Diane Melton Tr. v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*,

No. 15-CV-1151, 2016 WL 183492, at *8 (S.D.N.Y. Jan. 14, 2016) (quotation marks omitted),

*aff'd*, 697 F. App'x 708 (2d Cir. 2017).[5]  A district court reviews a bankruptcy court's

conclusions of law de novo, its discretionary decisions for abuse of discretion, and its findings of

fact for clear error.  *See Lubow Machine Co. v. Bayshore Wire Prods. Corp. (In re Bayshore*

*Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000).  Under the clear error standard, "there is a

strong presumption in favor of a [bankruptcy] court's findings of fact if supported by substantial

evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the

definite and firm conviction that a mistake has been committed."  *Travellers Int'l, A.G. v. Trans*

*World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994) (alteration and quotation marks omitted).

"Where there are two permissible views of the same evidence, the factfinder's choice between

them cannot be clearly erroneous."  *Id.* at 1574–75 (citation omitted); *see also UFCW Local One*

*Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015).

---

[5] While the quoted language, formerly found in Rule 8013, is no longer contained in the
Federal Rules of Bankruptcy Procedure, "logic still compels the same conclusion with respect to
the appellate powers of the District Court."  *In re Madoff*, 2016 WL 183492, at *8 n.14.

B.  Analysis

Appellants present six separate arguments on appeal, certain of which overlap:
(1) Appellants obtained valid judicial liens in the State Court Action, which conferred a property
right on Appellants that the Bankruptcy Court improperly allowed the Trustee to divest
Appellants of via a summary proceeding to approve a settlement agreement; (2) in approving a
settlement agreement that does not acknowledge Appellants' higher priority, secured claims in
the allocation of certain settlement proceeds, the Bankruptcy Court violated the Bankruptcy
Code as interpreted by the Supreme Court in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973
(2017) ("*Jevic*"); (3) the Bankruptcy Court abused its discretion in approving a settlement with a
purchase price of only $2.5 million when litigation in the State Court Action had established a
probability of success on the merits of the fraudulent conveyance and alter ego claims, which
were worth tens of millions of dollars; (4) the Bankruptcy Court abused its discretion in
approving a settlement that did not follow the proper procedure; (5) the Bankruptcy Court erred
in finding the Modified Offer to be a higher and better offer than Appellants' offer; and (6) the
Bankruptcy Court erred in identifying certain legal weaknesses in Appellants' arguments as to
the validity of their asserted liens, contributing to its erroneous finding that the Modified Offer
was a higher and better offer than Appellants' offer.  (*See* Appellants' Br. 1–3.)  Broadly,
Appellants raise four issues: (1) whether the Bankruptcy Court erred in finding the Claims—and,
by extension, the attachments—to be the property of the estate and eligible to be auctioned and
sold by the Trustee; (2) whether the Bankruptcy Court's approval of the settlement violated
*Jevic*; (3) whether the Bankruptcy Court properly considered the factors set forth in *Iridium Cap.
Corp. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d
Cir. 2007) in approving the settlement; and (4) whether the Bankruptcy Court erred in finding the

9

Modified Offer by the Settling Parties to be a higher and better offer than Appellants' offer.  (*See id.* at 18–21.)

The Court will discuss each in turn.

### 1.  Ownership of the Claims & Attachments

Appellants vociferously argue that their prejudgment attachments—awarded ex parte at the inception of the State Court Action—conferred a property right on Appellants that could not be disturbed without constitutional due process, which Appellants argue they were not afforded here.  (*See* Appellants' Br. 23–28; *see also, e.g.*, Appellants' Reply Br. 6–16.)  Both Appellees and the Trustee respond by pointing to the well-settled principle that fraudulent conveyance and alter ego claims such as those brought by Appellants are the property of the estate, and argue that because the attachments were predicated on these claims, the attachments too belong to the estate and will properly be annulled when the State Court Action is discontinued pursuant to the settlement agreement.  (*See* Appellees' Br. 21–27; Trustee's Br. 19–22.)  As such, no rights of Appellants were violated.  (*See id.*)  The Court considers this issue de novo, and agrees with Appellees and the Trustee.

First, it is worth making clear at the outset the function of the prejudgment attachments obtained by Appellants in the State Court Action.  While Appellants appear to characterize the attachments as quasi-mortgages the Appellants held against 535 WEA and 245 Trenor Drive, the function of the attachments in actuality was to secure Appellants' judgment in the event that the Claims succeeded.  As the New York Court of Appeals has explained: "By means of attachment, a creditor effects the prejudgment seizure of a debtor's property, to be held by the sheriff, so as to apply the property to the creditor's judgment *if* the creditor should prevail in court.  Attachment simply keeps the debtor away from his property or, at least, the free use thereof; *it does not transfer the property to the creditor*."  *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d

825, 828 (N.Y. 2009) (emphases added); *see also Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 783 N.Y.S.2d 758, 773 (Sup. Ct. 2004) ("Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy upon the property of the debtor in order to conserve the property for eventual execution." (citing *Michaels Elec. Supply Corp. v. Trott Elec. Inc.*, 647 N.Y.S.2d 839, 840 (App. Div. 1996))). It is for this reason that the statute provides that "[a]n order of attachment is annulled when the action in which it was granted abates or is discontinued, or a judgment entered therein in favor of the plaintiff is fully satisfied, or a judgment is entered therein in favor of the defendant." N.Y. C.P.L.R. § 6224. Because a prejudgment attachment is contingent on the success of the creditor's claims and the entry of judgment in the creditor's favor, a prejudgment attachment depends on the existence of such a claim. *See, e.g.*, *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 621 (S.D.N.Y. 2010) ("The attachment provisions of the CPLR give the attaching creditor a priority in the distrained property which it can look to in satisfaction of a future judgment. . . . The attaching creditor's priority secures the defendant's debt contingent on the entry of judgment in the former's favor."); *see also Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 64 (2d Cir. 1965) ("[T]he attachment lien is contingent and inchoate—merely a lis pendens notice that a right to perfect a lien exists." (quotation marks omitted)). As such, Appellants' attachments on 535 WEA and 245 Trenor Drive were dependent on the existence of the Claims, and contingent on the success of the Claims and an entry of judgment in Appellants' favor.

Second, it is clear that the Claims belong to the estate and thus were properly subject to sale by the Trustee. It is a well-settled principle of bankruptcy law that when a debtor files for bankruptcy, "the automatic-stay provisions of the Bankruptcy Code . . . operates to prevent certain creditors from 'pursuing their own remedies against the debtor's property.'" *Tronox Inc.*

*v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 99 (2d Cir. 2017) ("*Tronox*") (alteration omitted) (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("*St. Paul*")).  "Congress's intent was 'to protect all creditors by making the trustee the proper person to assert claims against the debtor,'" and "'[t]his reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion.'" *Id.* (quoting *St. Paul*, 884 F.2d at 701).  However, "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).  Thus, bankruptcy courts must distinguish between "so-called 'derivative claims'—i.e., claims 'based on rights derivative of, or derived from, the debtor's,'" *Tronox*, 855 F.3d at 99 (quoting *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 88 (2d Cir. 2013) ("*Madoff*")), and claims that are "particularized" to individual creditors.

"Whether the rights belong to the debtor or the individual creditors is a question of state law." *St. Paul*, 884 F.2d at 700.  However, the Second Circuit has broadly explained that:

> Derivative claims in the bankruptcy context are those that arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy.  In distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy.  In other words, we are wary of putting form over substance.  Thus, we inquire into the factual origins of the inquiry and, more importantly, into the nature of the legal claims asserted.  If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action.  Whereas a derivative injury is based upon a secondary effect from harm done to the debtor, an injury is said to be particularized when it can be directly traced to the third party's conduct.  Non-derivative claims are personal to the individual creditor and of no interest to the others.

*Tronox*, 855 F.3d at 100 (alterations, quotation marks, and citations omitted); *see also Madoff*,

721 F.3d at 70–71 ("The point is simply that the trustee is confined to enforcing entitlements of

the corporation.  He has no right to enforce entitlements of a creditor. . . . [T]here is a difference

between a creditor's interest in the claims of the corporation against a third party, which are

enforced by the trustee, and the creditor's own direct—not derivative—claim against the third

party, which only the creditor himself can enforce." (citation omitted)).[6]

Alter ego and fraudulent conveyance claims are quintessentially derivative, as they

definitionally seek to return assets to the estate that were wrongfully taken from it.  *See, e.g.*,

*Tronox*, 855 F.3d at 106 (characterizing fraudulent transfer claims as "paradigmatic example[s]

of claims general to all creditors").  It is for this reason that the Second Circuit has held that "[i]f

under governing state law the debtor could have asserted an alter ego claim to pierce its own

corporate veil, that claim constitutes property of the estate and can only be asserted by the

---

[6] In their Reply brief, Appellants heavily nitpick the cases cited by Appellees for these principles in an effort to obfuscate the governing law.  For example, Appellants attempt to dismiss in a cursory fashion the Second Circuit's decisions in *St. Paul* and *Tronox* as "irrelevant" because *St. Paul* applied Ohio law to the analysis of the alter ego claims at issue and *Tronox* applied Pennsylvania and Delaware law.  (*See* Appellants' Reply Br. 12–13.)  However, Appellants make no attempt to distinguish between the portions of those binding opinions expounding general principles of bankruptcy law and the portions applying state law, nor do Appellants demonstrate that Ohio, Pennsylvania, or Delaware law differs from New York law in any relevant way.  Indeed, as Appellees point out, (*see* Appellees' Br. 24 n.17), the court in *Stage Presence*—a case on which Appellants heavily rely, (*see, e.g.*, Appellants' Br. 28; Appellants' Reply Br. 13)—noted that while "in *Tronox* the alter ego claims were not governed by New York law, . . . the test affirmed by *Tronox is the same test* that has been used by other courts in deciding whether claims under New York law belong to the trustee or to individual creditors."  *Music Mix Mobile LLC v. Newman (In re Stage Presence)*, 592 B.R. 292, 298–99 (Bankr. S.D.N.Y. 2018) (emphasis added).  And, *St. Paul* has been cited favorably on multiple occasions by the New York Appellate Division—among other New York courts—applying New York law.  *See, e.g.*, *Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*, 902 N.Y.S.2d 123, 126 (App. Div. 2010); *Corman v. LaFountain*, 835 N.Y.S.2d 201, 203 (App. Div. 2007).  In short, Appellants' halfhearted attempts to distinguish these cases and dismiss the legal principles they set out are unconvincing.

trustee." *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). And, "under New York law, the trustee has standing to assert claims based upon piercing the corporate veil or alter ego liability, and creditors are precluded from pursuing those claims until they have been abandoned." *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 852 (Bankr. S.D.N.Y. 1994) (collecting cases); *see also Cardinal Holdings*, 902 N.Y.S.2d at 126 ("[T]he cause of action seeking recovery on the . . . judgment on an alter-ego theory was the property of the bankruptcy estate."); *Hearst Mags. v. McCaffery*, No. 101303/2011, 2012 WL 7658628, at *5 (N.Y. Sup. Ct. Aug. 31, 2012) ("The remedy for an injustice to creditors caused by [the] defendants is to allow the bankruptcy trustee to institute the alter ego claim as property of the [debtor's] estate. The trustee's exclusive standing to institute this claim furthers the bankruptcy proceeding's objective of ensuring similar treatment of similarly situated creditors by maximizing the pool of assets available to satisfy all creditors' debts proportionately: an objective that a continuation of this action based on the alter ego claim would frustrate." (citation and italics omitted)). Accordingly, the Bankruptcy Court properly found the Claims to be the property of Nordlicht's estate.

Appellants attempt to contend with this caselaw by disingenuously arguing that "each of these cases specifically emphasizes that a trustee could have standing to assert alter ego claims, if at all, only to the extent that they are not 'personal to any creditor'" and that "[h]ere, the alter ego allegations were clearly personal to particular creditors, namely the Stadtmauers who personally filed the lawsuit to collect on an award they personally won, and then personally obtained attachments over specific property." (Appellants' Reply Br. 13–14 (emphases and italics omitted) (quoting *Gosconcert v. Hillyer*, 158 B.R. 24, 28 (S.D.N.Y. 1993)).) But Appellants' repeated use of the word "personal" cannot convert Appellants' generalized, derivative claims

14

into particularized, individual claims. *See Tronox*, 855 F.3d at 100 ("[P]laintiffs often try, but are not permitted, to plead around a bankruptcy.").

The Second Circuit's decision in *Tronox* is, again, instructive. There, the court analyzed *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014), a Third Circuit case which "arose in the context of a motion to enforce a court order approving the settlement of a claim for fraudulent transfer." *Tronox*, 855 F.3d at 102. The debtor, Emoral, manufactured a chemical that had caused many individuals to suffer personal injury and subjected Emoral to many toxic tort lawsuits, forcing Emoral to file for bankruptcy. *See id.* But before Emoral filed for bankruptcy, the company sold certain assets to Aaroma. *See id.* After Emoral filed for bankruptcy, the trustee brought fraudulent transfer claims against Aaroma, which the parties later settled; as part of the settlement, the trustee agreed to release Aaroma from any claims that were property of the estate. *See id.* At the hearing to approve the settlement, a group of individuals with toxic tort claims against Emoral challenged the release and later sought to recover from Aaroma based on a theory of successor liability. *See id.* The bankruptcy court found the toxic tort plaintiffs' successor liability claim to be individual, and thus not the property of the estate and not subject to the release, but the district court reversed—a ruling that was upheld by the Third Circuit. *See id.* The Third Circuit found the successor liability claim to be the property of the estate because "'recovery on [the plaintiffs'] successor liability cause of action would . . . benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities.'" *Id.* at 103 (quoting *Emoral*, 740 F.3d at 880). The Second Circuit agreed with the Third Circuit's reasoning, explaining:

> That the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate. Indeed, *every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise*. But often there are claims against

third parties that wrongfully deplete the debtor's assets.  Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor.  *The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious: Every creditor has a similar claim for the diversion of assets of the debtor's estate.*  Those claims are general—they are not tied to the harm done to the creditor by the debtor, but rather are based on an injury to the debtor's estate creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor.

*Tronox*, 855 F.3d at 103–04 (emphases added).

Such is the case here.  While Appellants may have a personal claim against Nordlicht to collect on the arbitration award, Appellants' alter ego and fraudulent conveyance claims are secondary claims against third parties (namely, Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Islands Trust Limited, Trenor Investment Partners LP, Henley Investment Partners LP, and John Does 1–50): that these third parties "wrongfully deplete[d] [Nordlicht's] assets," *id.* at 103, leaving him with insufficient assets to satisfy the arbitration award.  Thus, the Claims are "not tied to the harm done to [Appellants] by [Nordlicht], but rather are based on an injury to [Nordlicht's] estate," *id.* at 103–04, and thus, can only be raised by the estate, *see also Madoff*, 721 F.3d at 70 ("[W]hen a creditor seeks relief against third parties that pushed the debtor into bankruptcy, the creditor is asserting a derivative claim that arises from harm done to the estate."); *Helicon Partners, LLC v. Kim's Provision Co., Inc.*, No. 12-CV-1602, 2013 WL 1881744, at *9 (Bankr. S.D.N.Y. 2013) (explaining that "the fraudulent conveyance claims" and the "claims alleging that [a third party] is a fraudulent

transferee or alter ego of the [d]ebtor," which had led to a prejudgment attachment, "must be pressed by the [t]rustee as the estate representative").[7]

Accordingly, the Court affirms the Bankruptcy Court's ruling that the Claims and, thus, the attachments, are the property of the estate.

### 2. Application of *Jevic*

Appellants appear to argue in their opening brief that because the proceeds from the sale of the Claims will be distributed to the general, unsecured creditors in Nordlicht's estate, the Order approving the settlement agreement functions to improperly skip over Appellants' secured claim, violating *Jevic*. (*See* Appellants' Br. 28–31.) In their reply brief, Appellants appear to change tack, arguing that it is Ms. Nordlicht's indemnification that violates *Jevic*, because the terms of the indemnification provide that it will be paid to general, unsecured creditors in the event that Appellants are found to have a secured claim in the sale proceeds by function of their asserted liens. (*See* Appellants' Reply Br. 16–18.) Appellees and the Trustee argue that (1) *Jevic* is inapplicable here because it does not apply to asset sales; and (2) that Appellants' argument is premised on the notion that they currently hold a secured claim, when in reality,

---

[7] Appellants make several attempts to convince the Court not to consider *Helicon*. (*See* Appellants' Reply Br. 14–16.) None is availing. First, Appellants argue that this portion of *Helicon* was "dicta, not a ruling," (*id.* at 15 (italics omitted)), but the Court fails to understand why the distinction between dicta and ruling has any relevance here. Distinguishing between an opinion's dicta and rulings can be important because rulings are binding on lower courts while dicta is not. However, *Helicon* is a decision from the U.S. Bankruptcy Court for the Southern District of New York, and as such, no part of its decision is binding on this Court—dicta or otherwise. Rather, the Court has cited to *Helicon* because its reasoning is persuasive. Second, Appellants seem to argue that *Helicon* is distinguishable because the sheriff's levy in *Helicon* occurred one day before the debtor entered into bankruptcy and thus, was avoidable by the trustee as a preferential transfer within 90 days of the petition. (*See id.* at 15–16.) But the status of Appellants' attachments has no bearing on whether the Claims are properly characterized as general or particularized; that analysis is based on the well-settled principles of bankruptcy law set forth above.

their asserted liens are disputed.  (*See* Appellees' Br. 28–30; Trustee's Br. 27–29.)  The Court also considers this issue de novo, and again agrees with Appellees and the Trustee.

Put plainly, Appellants' argument is a nonstarter.  As Appellants point out, *Jevic* concerns the distribution of assets via a Chapter 7 liquidation, and at the outset recites the Bankruptcy Code's "basic system of priority," in which "[s]ecured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts," "[s]pecial classes of creditors, such as those who hold certain claims for taxes or wages, come next in a listed order," and "[t]hen come low-priority creditors, including general unsecured creditors."  (Appellants' Br. 29 (quotation marks omitted) (quoting *Jevic*, 137 S. Ct. at 979).)  *Jevic* thus clearly upholds and applies the principle that priority distribution of assets depends on a creditor's status as holding a secured claim or an unsecured claim.  Therefore, Appellants could only conceivably have an argument under *Jevic* or with respect to priority distribution in general if their claim against Nordlicht's estate is secured.  However, the status of Appellants' claim is unsettled because their asserted liens—which would function to secure their claim against Nordlicht's estate—are disputed.  (*See, e.g.*, A.R. A055 (Apr. 23, 2021 Hr'g Tr.) (Appellants' counsel: "We all know the lien is in dispute.").)  Thus, Appellants' argument presupposes a finding that simply has not (yet) been made: that Appellants' asserted liens are valid.[8]

Appellants' argument as to Ms. Nordlicht's indemnification fares even worse. Appellants argue that "there is no merit to the Trustee's argument that, because the Stadtmauers did not have a lien over [Ms.] Nordlicht's assets, the settlement agreement could freely skip the Stadtmauers' lien priority to distribute [the indemnification] proceeds to junior, unsecured

---

[8] Appellants' response is to simply state without explanation or support that the unsettled status of their asserted liens is "beside the point."  (Appellants' Reply Br. 16.)  This Court disagrees: it is entirely "the point."

creditors." (Appellants' Reply Br. 17.) But a claim that is "secured by a lien on a property in which the estate has an interest . . . is a secured claim to the extent of the value of the creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). Thus, a creditor that holds a secured claim against a debtor's asset is entitled to the proceeds of the sale of that asset up to the amount necessary to satisfy the creditor's claim, but if the proceeds are less than the value of the creditor's claim, then the remainder of the creditor's claim is considered unsecured. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239 & n.3 (1989) ("[A] claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured. Thus, a $100,000 claim, secured by a lien on a property of a value of $60,000 is considered to be a secured claim to the extent of $60,000, and to be an unsecured claim for $40,000."). As such, if Appellants are ultimately found to have a valid lien against the $2.5 million proceeds of the sale of the Claims, their approximately $15 million claim against Nordlicht's estate will only be considered a secured claim to the extent of $2.5 million, and will be considered an unsecured claim for $12.5 million. *See id.* Because Appellants have no claim whatsoever to a lien over Ms. Nordlicht's indemnification, they will not be entitled to Ms. Nordlicht's indemnification except to the extent that they are ultimately distributed a portion of the indemnification to satisfy their unsecured $12.5 million claim.[9]

---

[9] Appellants also seem to press an argument that Ms. Nordlicht's indemnification must be considered as part of the sum paid to purchase the Claims, and therefore must be paid to Appellants if their asserted lien is found to be valid. (*See* Appellants' Reply Br. 17.) But, Appellants offer no authority for this proposition, which would vitiate the very purpose of the indemnification.

Accordingly, the Court affirms the Bankruptcy Court's ruling that the settlement agreement does not violate *Jevic*.

### 3.  Analysis of *Iridium* Factors

Next, Appellants argue that Judge Drain improperly weighed the factors set forth in *Iridium* in approving the settlement agreement.  (*See* Appellants' Br. 31–41; Appellants' Reply Br. 18–21.)  The Trustee does not address this argument, (*see generally* Trustee's Br.), but Appellees argue that Judge Drain's consideration of the *Iridium* factors was reasonable and thus merits the Court's deference, (*see* Appellees' Br. 31–43).  The Court reviews this issue for abuse of discretion and finds that Judge Drain did not abuse his discretion in approving the settlement agreement.

Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  "The Supreme Court set forth the standard a [b]ankruptcy [c]ourt should follow in determining whether or not it should approve a compromise agreement in [*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ('*TMT Trailer Ferry*')][,] . . . requir[ing] that the [b]ankruptcy [c]ourt make an informed, independent judgment as to whether a settlement is 'fair and equitable' and 'in the best interests of the estate.'"  *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (quoting *TMT Trailer Ferry*, 390 U.S. at 424).  The Second Circuit has made clear that "[i]n undertaking an examination of the settlement," a bankruptcy court's "responsibility . . . is not to decide the numerous questions of law and fact raised by [the] appellants but rather to canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (alteration omitted) (quoting *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972)).  Moreover, the

court "may give weight to the informed judgment of the trustee . . . and their counsel that a compromise is fair and equitable" and "may approve a settlement even if it believes that the trustee . . . ultimately would be successful at trial," considering the principle that "the law favors compromise." *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) ("*Drexel*") (quotation marks omitted).

"Courts have developed standards to evaluate if a settlement is fair and equitable, and to that end, courts in this Circuit have set forth factors for approval of settlements." *Iridium*, 478 F.3d at 462. As explained in *Iridium*,

> Those interrelated factors are: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*Id.* (quotation marks omitted); *accord Nuevo Pueblo, LLC v. Napolitano (In re Nuevo Pueblo, LLC)*, 608 F. App'x 40, 41 (2d Cir. 2015) (summary order) (same).

As a preliminary matter, it is worth noting which factors Appellants do not argue that the Bankruptcy Court considered improperly or weigh against approval. Appellants do not argue: (1) that the settlement agreement was not the product of arm's length bargaining; (2) that the Trustee, his counsel, and Judge Drain are not competent, experienced, and more than qualified to review the settlement, (*see* Appellants' Br. 40 ("Appellants acknowledge that the Trustee and his counsel are experienced bankruptcy professionals and the Bankruptcy Court was qualified to determine bankruptcy matters.")); or (3) that other creditors or parties in interest either objected to or did not affirmatively support the settlement, (*see, e.g.*, A.R. A029–30, A052 (Apr. 23, 2021

Hr'g Tr.) (counsel for two other creditors supporting the Trustee's position)).  Rather, Appellants

argue primarily that given the County Court's entry of the attachments and denial of the State

Court Defendants' motion to dismiss and the law of the case doctrine, the litigation was certain

to succeed and result in a huge recovery, warranting the risk of a protracted dispute.  (*See, e.g.*,

Appellants' Br. 33–39.)  Secondarily, Appellants argue that the releases provided in the

settlement agreement are overbroad.  (*See id.* at 40–41.)

Starting with the likelihood of success of the underlying litigation, the Court finds that

Appellants have overstated their case.  While Appellants are correct that they received favorable

rulings on preliminary motions made in the State Court Action and that "[t]he law of the case

doctrine generally applies to decisions made by a state court prior to removal to federal district

court," *Torah Soft Ltd. v. Drosnin*, 224 F. Supp. 2d 704, 710 (S.D.N.Y. 2002), Appellants all but

ignore the fact that these rulings were *preliminary*.  The County Court may have found that

Appellants' claims were likely to succeed on the merits in, for instance, granting their motion to

confirm their attachment, but the County Court also made clear that attachment is a "provisional"

remedy.  (*See, e.g.*, A.R. A204–05.)  The County Court's determination as to Appellants'

likelihood of success on the merits was therefore not binding.  "If it were otherwise, then

determination of the application for provisional remedy or interlocutory relief would be the be-

all and end all of such litigation.  Once, for example, a preliminary injunction is granted and

some of the issues have been passed on, it would be fruitless to set the matter down for trial if the

comments of the judge passing on the provisional remedy were to be therefore binding as 'the

law of the case.'" *Credit Français Int'l, S.A. v. Sociedad Financiera De Comercio, C.A.*, 490

N.Y.S.2d 670, 680, 576 (N.Y. Sup. Ct. 1985); *see also Madison Square Garden Boxing, Inc. v.

Shavers*, 562 F.2d 141, 144 (2d Cir. 1977) ("The preliminary injunction was by its very nature

interlocutory, tentative and impermanent.  The findings of fact made therein were not controlling on the ultimate issues, and the parties would have been free to retry those issues during the hearing on the merits leading to a final judgment." (citation omitted)); *Bannon v. Bannon*, 1 N.E.2d 975, 978 (N.Y. 1936) ("A judicial decision can constitute a conclusive adjudication of question of fact or law only when rendered in a proceeding in which a court had jurisdiction to render an irrevocable and final decision upon such a question. . . . Though an interlocutory judgment may require the immediate performance of acts which irremediably affect the rights of the parties, and in that sense may be final, yet in so far as it purports to decide the issues litigated in the action, the decision is subject to alteration and revision.").

The Court understands that it is Appellants' position that State Court Defendants "have no viable defenses," "are faced with little to no chance of winning at summary judgment," and generally face a "grim litigation outlook," (Appellants' Br. 36), but the reality is that if the State Court Action were to proceed, Appellants' success on the merits is not yet assured.  Therefore, Judge Drain did not abuse his discretion in noting that defenses would be available to the State Court Defendants when considering the litigation's possibility of success—particularly given the fact that in considering a settlement, it is not the responsibility of a bankruptcy court "to *decide* the numerous questions of law and fact raised by [the] appellants," *W.T. Grant*, 699 F.2d at 608 (emphasis added), and a bankruptcy court "may approve a settlement *even if it believes that the trustee . . . ultimately would be successful at trial*," *Drexel*, 134 B.R. at 505 (emphasis added).

Second, as to the likelihood of complex and protracted litigation, Appellants implicitly concede that this factor weighs in favor of settlement.  Appellants admit that a "frank assessment of almost any case means that 'protracted litigation' is possible," but argue that this risk here is "mitigated by many factors, including the existence of hard assets in [one Proposed

Supplemental State Court Defendant's] portfolio, the [a]ttachment and related liens that the Stadtmauers have obtained, and the fact this litigation has already survived a motion to dismiss." (Appellants' Br. 38–39.) But this argument is merely a restatement of Appellants' argument as to the litigation's possibility of success, which the Court has already found does not warrant reversal of the Bankruptcy Court's Order. *See supra*. And, as Appellees point out, Appellants have conceded that "extensive discovery remains to be taken" and that the litigation would likely go to trial, (*see* Appellees' Br. 37 (emphasis omitted)), which clearly indicates that the litigation would cause substantial delay to the administration of Nordlicht's estate. *Cf. In re Hilsen*, 404 B.R. 58, 75 (Bankr. E.D.N.Y. 2009) (explaining that "the expense, burden, and delay of complex and protracted litigation . . . is of particular consequence in the bankruptcy context, where the prompt administration of the bankruptcy estate, for the benefit of the debtor and creditors alike, is among a trustee's central objectives"). Therefore, the Court has little trouble finding that Judge Drain did not abuse his discretion in finding the legitimate risk of protracted litigation to counsel in favor of settlement. *See, e.g.*, *In re Pursuit Holdings (NY), LLC*, No. 18-BR-12738, 2019 WL 1220928, at *8 (Bankr. S.D.N.Y. Mar. 12, 2019) (finding risk of protracted litigation to counsel in favor of settlement where "[t]he [t]rustee believes that continuing the litigation . . . would likely take more than a year").

Third and finally, Appellants argue in their opening brief that the broad scope of the release in the settlement weighed against approval. (*See* Appellants' Br. 40–41.) However, in opposition, Appellees point out that the *Iridium* factor as to releases actually concerns "the nature and breadth of releases to be obtained by *officers and directors*," and thus is inapplicable here, (Appellees' Br. 38), and in reply, Appellants abandoned this argument entirely, (*see* Appellants' Reply Br. 18–21). "By failing to respond to [Appellees'] argument in [their] Reply

Memorandum, [Appellants] concede[] the point for purposes of [the Appeal]." *Cornelius v. Macy's Retail Holdings, Inc.*, No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019) (collecting cases); *see also Elliott v. Motors Liquidation Co. GUC Tr. Adm'r (In re Motors Liquidation Co.)*, No. 19-CV-5666, 2020 WL 3120379, at *6 (S.D.N.Y. June 12, 2020) (rejecting argument in bankruptcy appeal because, inter alia, "to the extent [the appellants] [made the argument] in their opening brief, they expressly abandoned any such argument in their reply").

Accordingly, the Court affirms the Bankruptcy Court's approval of the settlement agreement based on its consideration of the *Iridium* factors.

### 4. Analysis of the Higher & Better Offer

Finally, Appellants argue that the Bankruptcy Court erred in finding the Modified Offer by the Settling Parties to be a higher and better offer than Appellants' offer because the Bankruptcy Court misapplied New York law in evaluating the validity of Appellants' asserted liens. (*See* Appellants' Br. 41–44; Appellants' Reply Br. 21–25.) The Trustee does not address this argument, (*see generally* Trustee's Br.), but Appellees argue that the Bankruptcy Court's comparison of the offers was sound, (*see* Appellees' Br. 43–44). The Court reviews this issue for abuse of discretion and finds that Judge Drain did not abuse his discretion in finding the Settling Parties' Modified Offer to be a higher and better offer than Appellants' offer.

Appellants' argument on this issue appears to rest on the notion that the Bankruptcy Court improperly discounted the value of Appellants' offer to release their asserted liens by misapplying New York law to find that there were meritorious defenses against the liens. In evaluating this argument, it is useful to recall the timeline of the auction process for the Claims. The Settling Parties originally offered to purchase the Claims for $1.5 million, an offer that the Trustee rejected in favor of Appellants' offer to purchase the Claims for $2 million plus the

release of Appellants' asserted liens. *See supra* I.A.2. In finding Appellants' offer to be the higher and better offer as compared to the Settling Parties' initial offer, the Trustee explained that Appellants' offer provided "increased compensation for the sale and assignment of the very same [C]laims" and "avoids future litigation with the Stadtmauers regarding their claim that the proceeds of the settlement are subject to their asserted judicial lien." (A.R. A309.) The Settling Parties then offered $2 million to purchase the Claims plus payment of legal fees for the litigation over the Stadtmauers' liens, *see supra* I.A.2., an offer which the Trustee rejected as not a higher and better offer because "the Stadtmauers['] [offer] comes with the additional consideration . . . that we don't even have to fight over the [asserted lien]." (A.R. RA278.) It was for this same reason that the Trustee rejected the Settling Parties' next offer to purchase the Claims for $2.2 million. *See supra* I.A.2. The Settling Parties' Modified Offer—which the Trustee did ultimately find to be the highest and best offer and the Bankruptcy Court accepted— was for $2.5 million to purchase the Claims, plus the $2.5 million indemnification from Ms. Nordlicht and the separate payment of attorneys' fees to cover the litigation over Appellants' asserted liens. *See id.* The Trustee specifically explained that it was Ms. Nordlicht's $2.5 million indemnity that "change[d] the landscape," (A.R. A026), and Judge Drain found Ms. Nordlicht's $2.5 million indemnity to be "the major change," (*id.* at A045). Judge Drain also explained his belief that there were viable defenses to Appellants' asserted liens, including that the notices of attachments were not properly served and that the levy is void by the passage of time, and therefore that there was only a modest risk that the liens would operate to deprive the estate of the full $2.5 million proceeds, even in the absence of Ms. Nordlicht's indemnification. (*See id.* at A063–69.)

Now, Appellants seem to argue that had the Bankruptcy Court properly applied New York law in considering the likely validity of Appellants' liens, he would have found it likely that Appellants' liens would be upheld, entitling Appellants to the full $2.5 million proceeds from the sale of the Claims.  (*See* Appellants' Br. 41–44.)  And as a result, Appellants seem to urge that their offer of $2 million was the better offer, because the end result of Appellants' offer is that the estate (and its many creditors) would be enriched by $2 million and the end result of the Settling Parties' Modified Offer is that only Appellants would be enriched by $2.5 million. The fundamental flaw of this argument is that it entirely ignores Ms. Nordlicht's indemnification, which will be paid to the estate in the event that Appellants' asserted liens are upheld and Appellants thus receive the $2.5 million proceeds from the sale of the Claims as secured creditors.  The end result of the Settling Parties' Modified Offer is thus that the estate will be enriched by $2.5 million no matter what the outcome is as to Appellants' asserted liens— i.e., $500,000 more than the end result of Appellants' offer.  And, as Judge Drain rightly pointed out, "the Trustee never abandons $500,000."  (A.R. A053.)  Therefore, even if Judge Drain did misapply New York law as Appellants argue, this error was harmless.  *See, e.g.*, *Hart Env't Mgmt. Corp. v. Sanshoe Worldwide Corp. (In re Sanshoe Worldwide Corp.)*, 993 F.2d 300, 305 (2d Cir. 1993) (holding that the harmless error rule, which provides that "no error or defect in any ruling or order or in anything done or omitted by the court is ground for disturbing an order unless refusal to take such action appears to the court inconsistent with substantial justice and the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties" applies in bankruptcy proceedings (quotation marks omitted)).

Moreover, the Court must remind Appellants that in evaluating New York law as to Appellants' asserted liens, Judge Drain was not "decid[ing] the numerous questions of law and

fact raised by [A]ppellants but rather [simply] canvass[ing] the issues and see[ing] whether the settlement falls below *the lowest point* in the range of reasonableness." *W.T. Grant*, 699 F.2d at 608 (emphasis added) (quotation marks omitted).  Appellants have failed to demonstrate that Judge Drain abused his discretion as part of this exercise.

### III.  Conclusion

Accordingly, the Stadtmauers' appeal is denied and the Order of the Bankruptcy Court is affirmed.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:   May 19, 2022
             White Plains, New York

_____
             KENNETH M. KARAS
             United States District Judge